# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

TRADE SECRET, INC., *et al.*,[1]

Debtors.

Chapter 11

Case No. 10-_____ (__)

(Joint Administration Requested)

## DECLARATION OF BRIAN LUBORSKY IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, BRIAN LUBORSKY, do hereby declare, under penalty of perjury, that:

1.     I am the Chief Executive Officer of Trade Secret, Inc. ("Trade Secret"), a corporation duly organized under and existing pursuant to the laws of the State of Colorado and I am an officer, manager and/or director of each of the above-named debtors.  In my capacity as such, I have detailed knowledge of, and experience with, the business and financial affairs of Trade Secret and each of its following affiliates who are debtors herein (each a "Debtor", and collectively, the "Debtors"):  Premier Salons Beauty Inc. ("PSBI"), BeautyFirst, Inc. ("BeautyFirst"), Trade Secret Beauty Stores Inc. ("Trade Beauty"), Trade Secret Exclusive Stores Inc. ("Trade Exclusive"), Trade Secret Luxury Stores Inc. ("Trade Luxury"), Premier Salons Trade Secret Inc. ("PSTS"), and PureBeauty, Inc. ("PureBeauty").[2]

---

[1]     The Debtors in these cases, along with the last four (4) digits of their federal tax identification numbers (if applicable) are:  Premier Salons Beauty Inc. (EIN XX-XXX9717); Trade Secret, Inc. (EIN XX-XXX1292); Premier Salons Trade Secret Inc. (EIN XX-XXX9005); BeautyFirst, Inc. (EIN XX-XXX1954); Trade Secret Beauty Stores Inc. (EIN XX-XXX9804); Trade Secret Exclusive Stores Inc. (EIN XX-XXX9902); Trade Secret Luxury Stores Inc. (EIN XX-XXX9865); PureBeauty, Inc. (EIN XX-XXX4358).  The address for each Debtor is 3762 14th Avenue, # 200, Markham, Ontario L3R 0G7, Canada.

[2]     As used herein, "Trade Secret Group" refers to the retail stores collectively owned and operated by the Debtors.

2. As Trade Secret's Chief Executive Officer, I am one of the officers of the Debtors responsible for devising and implementing the Debtors' business plans and strategies, overseeing the Debtors' financial, operational and legal affairs, and supervising the maintenance of their books and records. In addition, in my capacities as an officer, manager and/or director of each of the Debtors, I have been involved in the Debtors' chapter 11 planning process (the "Chapter 11 Process"), including, inter alia, (i) participating in the development, negotiation and implementation of various strategic alternatives for restructuring, (ii) managing the advisors engaged by the Debtors in connection with the Chapter 11 Process, (iii) supervising the preparation of documentation needed to implement the Chapter 11 Process, and (iv) consulting on a regular basis with the Debtors' other officers and executives, and members of the Debtors' Boards of Directors or their equivalent, with respect to the foregoing.

3. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions (the "Petitions") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in an effort to preserve and maximize the value of their chapter 11 estates.

4. The Debtors intend to operate their business and to manage their properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

5. I am advised by counsel that this Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A. Overview of the Debtors

6. Under various banners, the Debtors currently own and operate approximately 612 retail and salon locations in shopping malls and strip centers throughout the

United States and Puerto Rico, on a collective basis. Trade Secret Group salons are designed to emphasize the sale of hair care and beauty products in a retail setting while providing high quality hair care services. Trade Secret Group salons offer one of the most comprehensive assortments of hair and beauty products in the industry. Trade Secret Group's retail selection consists of highly recognized brands, and the products held for sale vary with changing trends. All salons offer a full range of custom styling, cutting, hair coloring, and many stores also offer other nailcare and aesthetic services including facials, manicures, pedicures and waxing services. All stores sell a wide selection of professional hair care, skincare, cosmetics and sundry beauty products. Trade Secret Group's primary customer base includes the female head of the household shopping for her entire family, as well as singles shopping for their own beauty products and accessories. Trade Secret Group salons are primarily mall based, however, approximately 20% are located in outdoor shopping centers. The Trade Secret Group consists of stores operating primarily under four trade names: Trade Secret, Beauty Express, BeautyFirst, and PureBeauty®.

7. Product revenues represent approximately 87 percent of total revenues and the average ticket is approximately $26. For the fiscal year ended January 2010, the Debtors had revenues of approximately $220 million.

**B.      The Regis Transaction and the Debtors' Corporate Structure**

8. Prior to February, 2009, the stores comprising the Trade Secret Group were owned, directly or indirectly, and operated by Regis Corporation ("Regis"), a leader in the beauty salon, hair care and cosmetology industry. Upon information and belief based on filings made by Regis with the Securities and Exchange Commission (the "SEC"), Regis expected to experience operating losses of over $23 million on a fully allocated basis in fiscal year 2009

related to that segment of its business operations comprising the Trade Secret Group due to declining sales and losses it was incurring at many of its locations that were operated under long-term real property leases. Although Regis had attempted to stem these losses through various strategic efforts, their initiatives met with limited success. In the fall of 2008, Regis announced to its operating group that it would need to close between 225 and 250 locations that were not profitable, and that it was taking steps to deal with this large number of unprofitable locations, including retaining an external firm to help negotiate with landlords for the exit of these stores. However, in late 2008, Regis began a comprehensive review of its strategic and financial options related to the Trade Secret Group and, as a result, began to solicit interest from strategic buyers in acquiring the Trade Secret Group.

        9.     I am advised that Regis generally identified what it believed to be the likely strategic acquirers for the Trade Secret Group – principally either direct competitors of the Trade Secret Group salons or other entities who Regis thought might have an interest in acquiring these stores – and contacted those potential acquirers' to determine their interest in purchasing the Trade Secret Group. Other than entities affiliated with Premier Salons, Inc.,[3] none of these potential acquirers expressed any interest in acquiring the Trade Secret Group given its financial difficulties. I am advised that Regis also engaged in negotiations with one or

---

[3]     Premier Salons, Inc. ("Premier Salons US") and Premier Salons Ltd. ("Premier Salons Canada") and its U.S. and Canadian corporate affiliates own and operate 340 hair and cosmetic service salons throughout North America, with locations in specialty stores such as Saks, Sears, and Macy's. The Luborsky Family Trust ("LFT"), an Alberta Canada trust with which my family is affiliated, is also a shareholder of PS Hold Co., a Nova Scotia unlimited liability company, the indirect parent of Premier Salons US and Premier Salons Canada. The Luborsky Family Trust II 2009 ("LFT II"), an Alberta Canada trust with which my family is affiliated, is the sole shareholder of Debtor PSBI. LFT and LFT II are separate and distinct entities as are the Debtors and Premier Salons US, Premier Salons Canada, and their affiliates. None of Premier Salons US, Premier Salons Canada or any affiliate thereof is a debtor or debtor-in-possession in these chapter 11 bankruptcy cases.

more entities regarding the potential acquisition and/or liquidation of the Trade Secret Group inventory. These discussions ultimately proved fruitless.

10.     Following the conclusion of Regis' efforts to locate an acquirer for the Trade Secret Group, on or about January 26, 2009, Regis and Debtor PSBI entered into that certain Stock Purchase Agreement (the "Stock Purchase Agreement"), pursuant to which PSBI acquired the common shares of Debtor Trade Secret and its then-existing subsidiaries from Regis for the purchase price of $3.00[4] (collectively, the "Regis Transaction"). The Regis Transaction closed on February 16, 2009.

11.     In connection with the Regis Transaction, PSBI created three entities: Trade Beauty, Trade Exclusive, and Trade Luxury. Following the closing of the Regis Transaction, Trade Secret contributed all of its operating assets (other than a small number of leases and contracts) to these newly created entities on a tax-deferred basis in exchange for common shares of each subsidiary. In addition, Trade Secret owned two operating subsidiaries – PureBeauty and BeautyFirst – which remained wholly owned (either directly or indirectly) subsidiaries of Trade Secret after the closing of the Regis Transaction.

12.     As of the Petition Date, the Debtors' organizational structure is as follows: PSBI owns 100% of the ownership interests in Trade Secret and PSTS; Trade Secret owns 100% of the ownership interests in BeautyFirst, Trade Beauty, Trade Exclusive, and Trade Luxury; and BeautyFirst owns 100% of the ownership interests in PureBeauty. Attached hereto as Exhibit A is diagram reflecting the Debtors' corporate structure. Each of the Debtors' Board of Directors is comprised of three members: Brian Luborsky, an officer of each of the Debtors, as well as

---

[4]     Upon information and belief based on Regis' SEC filings, Regis derived substantial tax attributes related to the Regis Transaction despite the nominal consideration paid for the Trade Secret Group.

David Danziger and Hobart Truesdell, each of whom serve as independent directors. Messrs.

Danziger and Truesdell were appointed to the Debtors' Boards of Directors on May 1, 2010.

## C.    Asset and Debt Structure

13.    The Debtors' assets primarily consist of retail and service inventory and furniture, leasehold improvements, fixtures and small equipment located in their stores and corporate offices. The Debtors' stores are operated at leased locations, and the Debtors do not own any real property.

14.    In order to consummate and facilitate the transactions contemplated by the Regis Transaction and Stock Purchase Agreement, on or about February 2009, the Debtors and Regis entered into (i) a Security Agreement, and (ii) a Transition Services Agreement (collectively, the "Regis Security Agreements"). Through the Regis Security Agreements, Regis assisted the Debtors' transition to ownership, provided certain accounting, billing, payroll, purchasing, computer support, warehousing, marketing, administrative and other services and provided the Debtors with inventory necessary to stock its retail salons for ongoing operation. In exchange, Regis obtained a security interest in substantially all—if not all—of the Debtors' assets to secure the Debtors' obligations to Regis under the Regis Agreements in the initial principal amount of $15 million. The initial six (6) month duration of the Transition Services Agreement expired on September 30, 2009 at which time (i) Trade Secret Group assumed primary responsibility for the back-office functions with which Regis had assisted under the Transition Services Agreement, and (ii) Regis funded Trade Secret Group with an additional $15 million in inventory to stock its warehouse, which was necessary to ship replenishment of goods to its retail salons and for ongoing operations.

15.    In February 2010, the Debtors and Regis entered into a Forbearance Agreement with respect to the Debtors' obligations under the Regis Security Agreements, and

Subsidiary Security Agreement and Warehouse Services Agreement related thereto, whereby, among other things, (i) Regis agreed to forbear in enforcing its remedies under the Security Agreement as a result of the Debtors past-due obligations; (ii) the Debtors and Regis agreed to a payment schedule for paying down the Secured Obligations over a period of five (5) years; and (iii) Trade Beauty, Trade Exclusive and Trade Luxury entered into Guaranties and Subsidiary Security Agreements (each as defined in the Forbearance Agreement). As of the Petition Date, the Debtors believe that Regis was owed approximately $32 million under the Regis Agreements and that Regis holds a perfected security interest in substantially all, if not all, of the Debtors' assets.

16. As of the Petition Date, the Debtors have approximately $18 million in unsecured liabilities.

**D.     The Debtors' Business Operations**

17. The Trade Secret Group consists of four separate store concepts operating under the names Trade Secret, Beauty Express, PureBeauty and BeautyFirst. By far the largest of these concepts is the Trade Secret concept, which operates 484 stores in forty-nine (49) states, the District of Columbia and Puerto Rico (the "Trade Secret Stores"). Next largest is the Beauty Express concept which is comprised of fifty-three (53) stores in twenty (20) states (the "Beauty Express Stores"). BeautyFirst operates thirty-one (31) stores, and an additional thirty-nine (39) stores are operated under the BeautyFirst name by franchisees, with an overall footprint in seventeen (17) states (collectively, the "BeautyFirst Stores"). Finally, PureBeauty operates forty-four (44) stores in nine (9) states and the District of Columbia (collectively, the "PureBeauty Stores").

18. The Trade Secret Stores are primarily located in regional malls and focus heavily on retail sales, and these stores typically have only a few chairs on-site for providing in-

store salon services. As a result of focusing primarily on retail sales, the Trade Secret Stores are typically staffed with a small number of employees (2 to 4 per store) for both the sales and salon service areas. The Beauty Express Stores operate primarily in outdoor shopping centers. The Trade Secret Stores and Beauty Express Stores are operated by Trade Beauty, Trade Exclusive and Trade Luxury, even of which, respectively, own all of the physical assets, including inventory, at these stores. However, Trade Secret is the actual tenant at most of the Trade Secret Stores and Beauty Express Stores.

19.     The BeautyFirst and PureBeauty Stores focus primarily on providing salon services, although the sale of retail products is still greater than service sales. These stores are primarily located in outdoor shopping centers rather than regional malls, and they tend to be about twice as large in square footage as the Trade Secret mall-based stores. As a result of the higher concentration on providing salon services and an increased number of chairs or skincare rooms on-site, the PureBeauty and BeautyFirst Stores tend to staff more employees on each shift. In addition to the increased focus on providing salon services, the BeautyFirst and PureBeauty Stores stock a wider variety of products, including cosmetic products not typically found in Trade Secret Stores.

20.     The stores in the Trade Secret Group are managed in the field through several tiers of managers with responsibility over a progressive number of stores at each level. The stores are divided into geographic areas of approximately ten (10) stores, and each area is overseen by an area supervisor. Each area supervisor is a direct liaison to the stores in her or his area, including interaction with the manager at each store, who is typically a senior store employee with the primary additional responsibility for store-level employee issues. Each area supervisor reports to a regional manager that oversees a region of approximately ten (10) areas

and the area supervisors in that region.  There are eight (8) regions total.  The regional managers report directly to one of three Vice Presidents who in turn reports to the Senior Vice President of Operations.

21.     Product procurement and distribution for all stores are managed through a centralized system administered from the Debtors' corporate headquarters located in Markham, Ontario, Canada.[5]  The vast majority of the products sold by the Trade Secret Group are acquired by Trade Beauty,[6] stored in a warehouse owned and operated by Regis in Chattanooga, Tennessee (the "Regis Warehouse") and used by the Trade Secret Group pursuant to the terms of Debtors' Warehouse Services Agreement with Regis (the "Warehouse Agreement").  Pursuant to the Warehouse Agreement, Regis is responsible for managing the receipt of the Debtors' inventory into the Regis Warehouse and delivering the Debtors' inventory from the Regis Warehouse to the Debtors' various retail locations and its franchisees.[7]  Shipments from the Regis Warehouse are initiated by the head office and sent to the various stores in the Trade Secret Group either (i) automatically when the Debtors' distribution management system determines that a particular store needs a replenishment of inventory, or (ii) upon approval of an individual stores' request for replenishment of specific inventory.  Shipments are made to each Debtor from the Regis Warehouse with title passing at the point of shipment, and contemporaneous therewith, Trade Beauty books an intercompany transaction against the

---

[5]     As discussed below, the G&A Services (defined below) are actually provided by Premier Trade Canada and Premier Salons Canada.

[6]     Trade Beauty is the Debtor counterparty to the majority of the Debtors' primary procurement and vendor contracts.  For store-level contracts, the Debtor operating a particular store is typically the counterparty to such contract.  However, at the request of certain non-Debtor counterparties, PSBI and Trade Secret are the Debtor-counterparties to certain contracts.

[7]     Under the Warehouse Agreement, the Debtors and Regis share various costs incurred in operating the Regis Warehouse, allocated on a formula incorporating both the number of items and total pounds shipped by each entity as the basis for determining the sharing of the overall warehouse costs.

recipient Debtor for the actual cost of the goods transferred from the Regis Warehouse to such Debtor. The charges incurred under the Warehouse Agreement are allocated across each of the operating Debtors and the Debtors' franchisees (with a small mark-up charged to franchisees).

22. While the majority of products are purchased by Trade Beauty and stored in, and distributed from, the Regis Warehouse pursuant to the Warehouse Agreement, certain products are procured through other channels. Approximately 2% of products purchased by the Debtors are shipped to the Debtors' stores directly by the vendor, and the shipments are initiated based on replenishment determinations made at the Debtors' head office. Additionally, because BeautyFirst Stores and PureBeauty Stores have a wider product line than the Trade Secret Stores, certain vendors only deal with BeautyFirst and/or PureBeauty. These products are either distributed through the Regis Warehouse or, in some cases, shipped directly by the vendor to the individual store location. In addition to products for retail sale, the Debtors' stores are stocked with materials consumed in operating the Debtors' in-store salons ("Back-Bar Products"), which are usually stocked in, and distributed through, the Regis Warehouse. The Back-Bar Products are ordered upon request from individual stores on an as-needed basis and are shipped to individual stores directly from the Regis Warehouse.

23. In addition to a centralized procurement and distribution system, the Debtors have also undertaken other opportunities to streamline their business operations. The Debtors own, and are in the process of implementing, a proprietary point-of-sale system used to track sales and receipts at each store. The Debtors also take advantage of third-party service providers to consolidate the payment obligations associated with operating a 612-store enterprise. The Debtors have a contract with Advantage IQ, a firm responsible for managing and aggregating lease-hold related obligations arising in connection with operating the Trade Secret

Group's stores, such as power and electric consumption charges.  Additionally, the Debtors

utilize a service provided by Thompson/Reuters to manage the various tax obligations that arise

as a result of the national footprint of the Trade Secret Group, including sales, use, franchise and

excise taxes.

24.     Premier Salons Beauty Canada, Inc. ("Premier Trade Canada"), Premier

Salons US and Premier Salons Canada are each non-debtor corporations associated with the

Debtors.  Premier Trade Canada operates twelve (12) stores in Canada using either the Trade

Secret or  Beauty Express name.  Premier Trade Canada, Premier Salons US and Premier Salons

Canada (collectively, the "Premier Entities") share certain corporate and administrative

functions, including (without limitation), accounting, payroll, treasury, purchasing, logistics and

merchandising services (collectively, the "G&A Services").   The Premier Entities also provide

the majority of the G&A Services necessary to operate the Debtors' business, although the

Debtors do manage some of their own G&A Services from the Minneapolis, Minnesota

corporate offices of Premier Salons US.

25.     Traditionally, the corporate expenses for the G&A Services provided by

the Premier Entities (the "G&A Expenses") have been allocated among the Debtors and the

Premier Entities on a percentage of sales basis.  At the beginning of the fiscal year, the Debtors

and the Premier Entities prepare estimates of the total anticipated G&A Expenses and using the

sales of the respective entities for the previous year, the estimated G&A Expenses are allocated

among the Debtors and the Premier Entities (after taking into account certain requirements

resulting from income tax-related transfer pricing considerations),[8] and corresponding monthly

contributions from the Debtors to Premier Trade Canada and Premier Salons US are determined.

---

[8]      In accordance with intercompany transfer pricing practices acceptable to both Canadian and U.S. tax
authorities, cross-border charges between entities for administrative services are marked up by 7%.

At the end of the year, a true-up occurs based on the actual amount of G&A Expense incurred and actual sales for each entity.  Each Month, Trade Beauty pays CAD$450,000 to Premier Trade Canada and $200,000 to Premier Salons US for the Debtors' allocated portion of the G&A Expenses.  Trade Beauty then allocates these payments among each of the Debtors based on the percentages of sales as among the Debtors, and the Debtors record appropriate intercompany claims for these amounts.[9]

**E.      Events Leading to the Debtors' Bankruptcy Filing**

26.      The Debtors have been operating at an overall negative EBITDA for the past several months and do not expect to reach profitability in the absence of a debt and operational restructuring, which will include closing unprofitable locations.  Indeed, the Debtors believe that nearly eighty (80) stores are losing money at an unsalvageable rate, and the Debtors are filing contemporaneous herewith a request to reject the leases for those stores.  In addition, a significant number of stores require rent reductions from the Debtors' landlords in order to continue to operate without further losses.

27.      Several factors have precipitated the Debtors' chapter 11 filings.  First, while the Trade Secret Group had been profitable in the past, due to market and other conditions in the years prior to the Debtors' acquisition from Regis, the stores suffered significant sales and profitability decline.  Despite Regis' efforts to stem these declines and to turn around operations, it was not able to do so.  Unfortunately, various factors have made it more difficult to make this group profitable since the Debtors' acquisition from Regis including the overall economic downturn, the debtors inability to negotiate the closure of unprofitable stores, and the unexpected severe disruptions in its purchasing, store inventory replenishment, and accounting functions that

---

[9]        As set forth below, the Debtors are requesting authority to continue to honor their obligations to the Premier Entities on account of the G&A Services.

occurred when it took over the logistics and back-office functions from Regis in September 2009.

28.     The Debtors had, in fact, slowed the sales decline during the first half of 2009 and finally had recorded comparative store sales increases by September of 2009. However, the severe difficulties that resulted from the malfunctioning of the computer systems resulted in the loss of the ability to accurately monitor store results and properly replenish store inventories after October 2009.  Although these difficulties have gradually been eliminated after great efforts within the head offices, the capabilities of the system are still severely limited by the existence of non-internet based dial-up modem systems, which have very limited capabilities of reporting data to the head offices.

29.     Second, the Debtors submit that a substantial factor behind their operating losses was the alteration of consumer behavior in this difficult economic environment which started during 2008, and has continued to worsen after the Regis acquisition.  The Debtors' customers are cutting back on discretionary expenditures, resulting in a slowdown in spending and a lengthening of salon visitation patterns.  For the calendar year ended 2009, industry studies indicate an overall decline in the 10-15% range for the professional hair-care product categories that comprise most of the Debtors' business.

30.     A third factor that has affected the Debtors' overall financial condition and necessitated these filings is a burdensome lease-hold portfolio that is not entirely complementary with the Debtors' business model.  A number of the Debtors' stores were losing substantial amounts of money when they were acquired from Regis as a result of having leases with above-market rental rates or with inappropriate store locations, and cannot be sustained solely from the revenues generated at those stores.

31.     The Debtors have been able to improve their computer systems and have taken affirmative steps to aid their liquidity and stem their losses through measures such as reduction in work force, store closures, redeployment of inventory, and renegotiation of lease terms.  However, for many of these leases, the Debtors cannot continue to sustain operations at these stores with the existing lease structures.  As a result of declines in both the market for their goods and in overall mall traffic, the stores have fewer customer visits, and a significant number of the stores in the Trade Secret Group are unable to operate on a cash-flow positive basis at the store-level.

32.     The Debtors have continued their efforts to improve store performance. Various cost-cutting measures have been taken, underperforming locations have been closed, reduced rents have been negotiated where possible, and new products and services have been added to the merchandise offerings.  The Debtors have also instituted new pay plans to provide more incentives for employees to reward improved employee performance, and upgraded service levels at most or all of their locations.  Unfortunately, these measures have been insufficient to eliminate the losses that existed when the Trade Secret Group was taken over from Regis, and due in part to the computer system failure after the transition, it has been difficult to sustain improvement without adequate information and within a segment of retail that has continued to decline.

33.     The Debtors believe that most of their stores are strong and viable within their markets, and they can improve performance with the changes that have been introduced, and with the more recent capabilities of its information systems.  However, given the poor store performance of so many of the stores within the acquired group, the continued overall decline in retail activity within haircare, the Debtors' unhealthy balance sheet, and the incompatibilities in

the Debtors' lease portfolio, a large scale restructuring that will eliminate unprofitable locations and result in a viable entity going forward is required. Accordingly, after considering other alternatives, the Debtors' Board of Directors, in their reasonable business judgment, concluded that the most effective way to maximize the value of their estates for the benefit of creditors is to complete a prompt sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code, subject to higher or better bids at a public auction (the "Sale Transaction").

34. To this end, prior to the Petition Date, the Debtors, their management and professionals approached Regis – their secured lender – to determine Regis' interest in acting as a stalking horse bidder with respect to a sale of substantially all of the Debtors' assets. It was the view of the Debtors' management that Regis was the most likely candidate to successfully act as the stalking horse bidder with respect to any sale of substantially all of the Debtors' assets given Regis' history with, and recent sale of, the Trade Secret Group to PSBI, the business synergies currently in place by and among Regis and Trade Secret Group, Regis' overall place in the competitive market in which the Debtors' operate, and Regis' secured position with respect to substantially all, if not all, of the Debtors' assets. In mid- to late-June 2010, Regis confirmed its desire to act as the stalking horse bidder with respect to a sale of substantially all of the Debtors' assets and, shortly thereafter, the parties negotiated and agreed to a term sheet (the "Term Sheet") for the sale of substantially all of the Debtors' assets to a joint venture of Regis and a newly formed affiliate of LFT II (an insider of the Debtors and a trust with which I am affiliated) for a combined purchase price of (i) $32 million representing a credit bid from Regis, and (ii) assumption of liabilities anticipated to be approximately $13 million, for a total purchase price of $45 million. The Debtors anticipate reducing the Term Sheet to a formal Asset Purchase Agreement (the "APA"). Pursuant to the Term Sheet and anticipated APA, Regis' rights under

the APA will be assigned to a newly formed affiliate of LFT II which intends to continue the Trade Secret Group's operations, as a scaled down operation that eliminates unprofitable stores, and will continue to employ a substantial number of the Debtors' existing employees.

35.     The Debtors believe that the transactions with Regis and LFT II contemplated under the Term Sheet – or a similar transaction to an alternative purchaser – will result in the emergence of a much stronger and economically viable retail enterprise that will maximize the value for the Debtors' businesses and ultimately benefit all creditor constituents. The Debtors believe that Regis' willingness to act as a joint venture partner in the stalking horse bid with respect to the sale of substantially all of the Debtors' assets is a significant step in preserving hundreds of retail stores on which their suppliers and landlords can continue to rely for ongoing business, and on which customers can rely for the superior services provided by the Trade Secret Group.  Moreover, the Debtors believe that the consummation of the APA or a similar transaction to an alternative purchaser will be a driving force in preserving thousands of retail jobs.  It is the Debtors' intention to use Regis' bid to set the platform for competitive bidding that will ultimately result in a value maximizing transaction to the benefit of all creditors.

36.     To advance the foregoing goals, the Debtors – in consultation with their management and professionals – have retained the services of an experienced investment banker, SSG Capital Advisors, LLC, to assist the Debtors in conducting a fairly rapid, but robust post-petition marketing process to determine whether any bids higher and/or better than that contemplated by the Term Sheet are available in the marketplace.  Moreover, contemporaneous with their chapter 11 filing, the Debtors have filed a motion seeking approval of an auction

process through which Regis will act as the stalking horse bidder and, assuming other bids are received, will conclude with an auction and sale hearing in the fairly near term.

37.     Furthermore, prompt approval of the Debtors' proposed sale timeline and Bidding Procedures is critical for a number of reasons in order to preserve the value of the Debtors' assets.  First and foremost,  given the level of competition in the Debtors' industry, the longer the Debtors remain in chapter 11, the more likely that the Debtors' competitors will attempt to persuade their skilled stylists and Beauty Advisors to leave the Debtors' employ in favor of one of their competitors, which will result in the direct loss of customers as these employees advise their "book" of customers they are going elsewhere, attrition the Debtors can ill-afford.  Second, the Debtors' liquidity constraints demand a prompt process to facilitate an orderly sale, closing and transition of the Debtors' assets to the Purchaser or an alternative buyer that will ultimately benefit all of the Debtors' various stakeholders.  Lastly, the Debtors' proposed timeline contemplates a closing in early to mid-September, which is approximately the time the Debtors would typically – and a purchaser will be required to – implement their purchasing and advertising programs for the very important holiday season.  Unless orders can be placed, marketing initiatives finalized, and merchandise purchased and shipped in time, the holiday season will fail and the value of the Debtors will suffer greatly as a result.  A delay in properly preparing for  the industry's busiest season would result in a significant competitive disadvantage to the buyer of the Debtors' assets.

F.     **First Day Papers**

38.     As a result of my first-hand experience, and through my review of various materials and information, discussions with other of the Debtors' executives, and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the

relief sought by the Debtors in their "first-day" applications and motions described below (collectively, the "First Day Papers"),[10] (b) the need for the Debtors to continue to operate effectively, (c) the deleterious effects upon the Debtors of not obtaining such relief, and (d) the immediate and irreparable harm to which the Debtors will be exposed immediately following the Petition Date unless the relief requested in the First Day Papers is granted without delay.

39.     I submit this Declaration in support of the Debtors' petitions and First Day Papers filed with the Court in connection with the commencement of these cases and described below.

40.     I participated in preparing and have reviewed each of the First Day Papers (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Papers.

41.     The relief sought in the First Day Papers will minimize the adverse effects of the instant chapter 11 cases on the Debtors and result in maximum creditor recoveries. I believe that the relief sought in each of the First Day Papers is necessary to enable the Debtors to operate effectively in chapter 11 as debtors-in-possession.

42.     As described more fully below, the relief requested in the First Day Papers was carefully tailored by the Debtors, in consultation with their advisors, to ensure that the Debtors' immediate operational needs are met and that the Debtors suffer no immediate and

---

[10]     Capitalized terms used in the description of each First Day Paper, shall have the meanings ascribed to such terms in the applicable First Day Paper.

irreparable harm.  I personally participated in the analysis that lead to the creation of each of the

First Day Papers and assisted in the drafting and development of the relief requested therein.  At

all times, the Debtors' management and advisors remained cognizant of the limitations imposed

on debtors-in-possession and, in light of those limitations, the Debtors narrowed the relief

requested at the outset of these cases to those issues that require urgent relief to sustain the

Debtors' immediate operability.

### i.     Motion for Joint Administration

43.     The Debtors believe that many of the motions, applications, hearings and

orders that will arise in these chapter 11 cases will jointly affect each and every Debtor.  Under

these circumstances, the Debtors believe that the interest of the Debtors, their estates, their

creditors and other parties in interest would be best served by the joint administration of these

chapter 11 cases for procedural purposes only.  The Debtors further believe that joint

administration of these chapter 11 cases will ease the administrative burden on the Court and all

parties in interest and will protect creditors of the respective estates against potential conflicts of

interest.  Finally, the Debtors believe that administering these cases under the case name and

case number of Trade Secret, Inc. will avoid any confusion between the Debtors' cases and other

non-debtor entities.

44.     For these reasons, the Debtors submit, and I believe, that the relief

requested in this motion is in the best interest of the Debtors, their estates and their creditors, and

therefore should be approved.

### ii.     Application to Retain Claims and Noticing Agent

45.     By this Motion, the Debtors seek entry of an order authorizing the Debtors

to retain Epiq Bankruptcy Solutions, LLC ("Epiq") as their claims, notice and balloting agent

("Agent").  Upon information and belief, Epiq is an experienced Agent and is frequently used by debtors in large chapter 11 cases, and I believe Epiq is well qualified to serve as Agent in these cases.  The employment of Epiq will also provide the Debtors with efficient management of the claims, noticing and balloting processes in these cases, thereby leaving the Debtors' management and advisors to focus on the Debtors' reorganization efforts.

46.     For these reasons, the Debtors submit, and I believe, that the relief requested in this application is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

iii.     *Motion for Interim Order Deeming Utilities Adequately Assured*

47.     By this motion, and to ensure continued provision of utility services (the "Utility Services") to the Debtors' headquarters and their 612 retail store locations, the Debtors seek entry of an order prohibiting utility companies (the "Utility Companies") from terminating services on account of pre-petition invoices, deeming the Utility Companies to be adequately assured of future payment, and establishing procedures to resolve additional requests for adequate assurance.  The Debtors propose to establish a segregated account into which the Debtors will deposit the sum of $175,000, which is equal to 50% of the Debtors' approximate monthly costs for Utility Services on a historical basis (collectively, the "Utility Deposit") and, additionally, have proposed procedures to address any request made by the Utility Companies for additional adequate assurance.

48.     Any disruption of the Utility Services at the Debtors' retail locations would cause irreparable harm to the Debtors' business operations and their estates.  The successful operation of the Debtors' stores requires that the Utility Services be provided on a continual and uninterrupted basis.  The Debtors have over 3,000 individual accounts with Utility

Companies and have established a good payment history with virtually all of their Utility Companies. To the best of the Debtors' knowledge, they have no defaults or arrearages of any significance with respect to the Debtors' undisputed Utility Services invoices. However, any disruption of Utility Services will have a significant impact on the Debtors' business operation, revenues, customers and employees.

49. In order to ensure the timely payment of the Utility Companies, the Debtors have engaged Advantage IQ, Inc. ("Advantage") to assist with the administration and payment for services provided by the Utility Companies. Advantage charges the Debtors $4.65 per month, per account, to receive, document and compile each of the Debtors' monthly invoices from the Utility Companies, and then, upon funding from the Debtors, disburse payments to the Utility Companies to satisfy these invoices. In order to ensure that Advantage continues to serve as the Debtors' utilities aggregators following the Petition Date, the Debtors are requesting authority to satisfy, in the Debtors' discretion, amounts owed to Advantage that accrued prior to the Petition Date. Advantage is the primary contact point between the Debtors and the Utility Companies, and their continued efforts will be essential to avoiding any disruption in services that may arise as a result of the Debtors' chapter 11 filing. If Advantage were to cease providing, or even delay providing, the aggregator services it provides to the Debtors, the Debtors' operations would be subject to the potential for significant disruptions in utility services.

50. For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

*iv.*       *Motion for Authority to Pay Certain Pre-Petition Taxes*

51.       By this motion, the Debtors request authorization (but not direction) to pay certain taxes that the Debtors are required to collect from third-parties and hold for a period of time before remitting them to the appropriate taxing authorities (the "Trust Fund Taxes") and certain franchise, business and occupation taxes (the "Business Taxes" and together with the Trust Fund Taxes, the "Taxes"). Additionally, the Debtors may be required to obtain permits and licenses to provide their salon services within the jurisdictions within which the Debtors operate (the "Licenses" and with the Trust Fund Taxes, the Business Taxes and the penalties, interest or other such charges that may be assessed thereon, the "Taxes"). For a number of the Taxes, the taxing authorities (the "Authorities"), are authorized under state law to collect obligations directly from the Debtors' individual officers and directors if such Taxes remain unpaid. The Debtors seek authority to pay any Taxes that were accrued pre-petition but were not in fact paid or processed pre-petition, or were paid pre-petition in an amount less than is actually owed, or to the extent any such payments made pre-petition were rejected, lost or otherwise not received in full by any Authority. Further, there may be Taxes incurred or collected from sales and services provided pre-petition that will come due shortly after the filing, which the Debtors seek authority to pay pursuant to this Motion. Finally, to the extent that any checks, drafts, deposits or transfers issued or initiated by the Debtors on account of pre-petition Taxes have not cleared as of the Petition Date, the Debtors also seek an order directing banks and other financial institutions to honor and process such payments.

52.       The Debtors believe that some, if not all, of the Authorities may initiate an audit of the Debtors if the Taxes are not paid on time. Such audits will unnecessarily divert the Debtors' attention away from the Chapter 11 Process and result in unnecessary expenses.

Moreover, if the Debtors do not pay such amounts in a timely manner, the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, seek payment from the Debtors' directors and officers and pursue other remedies that will materially and immediately harm the estates. Moreover, many of the outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the Authorities. Therefore, such funds do not constitute property of the estate and could not otherwise be used by the estates. Finally, the Debtors are obligated to obtain the Licenses in order to provide services in the various jurisdiction within which they operate. If the Debtors are not able to satisfy the amounts owed in connection with the Licenses, they run the risk that the Licenses will be revoked or will not be renewed.

53.     I believe that the Debtors' failure to pay the Taxes could have a material adverse impact on their ability to operate in the ordinary course of business and thus harm the Chapter 11 Process to the detriment of all constituents. Additionally, any attempts to collect the Taxes from the Debtors' officers and directors has the potential to divert the attention of those individuals away from the Chapter 11 Process. Therefore, I believe it is appropriate to pay, and the Debtors seek the authority to pay, in their sole discretion, the Taxes, including any penalties and interest thereon, if any, and any liability resulting from audits of pre-petition Taxes, to the relevant Authorities in the ordinary course of business.

54.     In order to manage the nation-wide obligations that the Debtors have to the Authorities, the Debtors have retained Tax Partners, LLC ("TP"), an affiliate of Thompson Reuters, to serve as an aggregator of the Debtors' tax obligations. TP compiles, on a monthly basis, the Debtors' obligations to the various Authorities for the Trust Fund Taxes and provides the Debtors with a monthly accounting and summary of funding obligations for the various due

dates for the Trust Fund Taxes. The Debtors fund TP with amounts necessary to satisfy the Debtors' tax obligations, and TP disburses these amounts to the appropriate jurisdiction. The Debtors pay TP approximately $7,500 per month for these services. The services provided by TP are essential to ensuring that the Debtors timely satisfy their obligations to the Authorities for the Trust Fund Taxes. If TP ceased providing these services, the Debtors would need to expend considerable resources in replicating the services provided by TP. These efforts may also cause the Debtors to become delinquent in payment of the Trust Fund Taxes, increasing the likelihood that the Debtors would be subject to Audits, and any Audits would place a further strain on the Debtors' resources and the time of the Debtors' senior management.

     *v.*       *Motion to Approved Continued Use of Cash Management System*

     55.     By this motion, the Debtors seek entry of an order (a) authorizing the continued use of their existing cash management system, (b) authorizing the continued use of their existing bank accounts and business forms, (c) authorizing their deposit practices and waiving the requirements of section 345(b) of the Bankruptcy Code in connection therewith on an interim basis, and (d) authorizing the grant of administrative expense status to Intercompany Claims and authorizing the Debtors to continue to fund the G&A Expenses to the Premier Entities. In connection with this relief, the Debtors respectfully request a waiver of certain of the UST Guidelines established by the US Trustee in this District that require the Debtors to close all pre-petition bank accounts, open new accounts designated as debtor-in-possession accounts, and provide new business forms and stationery.

     56.     As described in detail in the Motion, the Debtors maintain a cash management and disbursement system in the ordinary course of their operations (the "Cash Management System"). The Cash Management System allows the Debtors to effectively collect

cash receipts and make disbursements to satisfy obligations to the Debtors' creditors. To lessen the disruption caused by the bankruptcy filings and maximize the value of their estates in these chapter 11 proceedings, it is vital to the Debtors that they maintain their Cash Management System. Additionally, because the Debtors' business relies on an extensive number of intercompany transactions, it is essential that the Court grant administrative expenses status to Intercompany Claims arising after the Petition Date, so as not place a disproportionate burden on one Debtor's estate for the overall cost of these cases.

57. Finally, continuing the funding of the G&A Expenses to the Premier Entities is essential to transitioning into these chapter 11 cases. The operation of the Debtors' business is highly dependent on the various services provided by the Premier Entities and their employees. Conversely, the Premier Entities depend on regular payment by the Debtors for their allocated share of the G&A Expenses to fund the increased expenses that are incurred by the Premier Entities as a result of managing the Debtors' US operations in addition to their own operations. By this Motion, the Debtors seek the authority to continue to satisfy their allocated portion of the G&A Expenses in the ordinary course of business without regard to whether those amounts relate to pre- or post-petition periods. Given the critical importance of the Premier Entities and the services they provide to the Debtors' operations, the Debtors can ill-afford any disruption in the services provided by the Premier Entities. It is possible, however, that the Debtors' failure to pay their allocated portion of the G&A Expenses would leave the Premier Entities without sufficient liquidity to continue to satisfy their own obligations in the ordinary course of business, resulting in disruption to their businesses and, by extension, the Debtors' business. For the foregoing reasons, the Debtors submit that it is appropriate to authorize the Debtors to continue to fund the Premier Entities for the Debtors' G&A Expenses in accordance

with the Debtors' pre-petition practice without regard to whether such amounts relate to pre- or post-petition periods.

58.     The Debtors maintain current and accurate accounting records of daily cash transactions and submit that maintenance of this Cash Management System is vital to prevent undue disruption to the Debtors' business operations while protecting the Debtors' cash for the benefit of the estates.  It is critical that the Debtors be able to consolidate management of cash and centrally coordinate transfers of funds to efficiently and effectively operate their large and complex business operations.  Substantially disrupting their current cash management procedures would impair the Debtors' operations and ability to optimize their business performance.

    *vi.*        *Motion for Authority to Pay Employee Wage and Related Items*

59.     Pursuant to this motion, the Debtors are seeking authority to honor and pay all pre-petition employee wages, salaries and other accrued compensation, and to continue to honor certain other policies, programs and benefits the Debtors provide to their employees in the ordinary course of business.

60.     The Debtors have a current workforce of approximately 3,400 employees nationwide.  The majority of these employees are hourly employees working in the Debtors' 612 retail locations around the country, and the balance are salaried employees working in supervisory or corporate office roles.  In connection with their employment, the Employees are provided the opportunity to participate in several company administered and supported employee health and welfare benefits programs.  The vast majority of these employees rely exclusively on their full compensation, benefits and the reimbursement of business expenses to continue to meet their daily living needs and expenses, and these employees will be exposed to significant

financial difficulties if the Debtors are not permitted to pay the unpaid employee obligations. The Debtors believe that if they are unable to honor all such obligations immediately, employee morale and loyalty will be jeopardized at a time when such support is critical.

61. The uninterrupted continuation of the Debtors' business is critically dependent upon a stable work force. The Debtors believe that any significant number of employee departures or deterioration in morale at this time will immediately and substantially adversely impact the Debtors' businesses and result in immediate and irreparable harm to the estates and their creditors. There is a real, immediate risk that if the Debtors are not authorized to continue to honor their pre-petition employee obligations in the ordinary course, the employees would no longer support and maintain the operations of the Debtors, thereby crippling the Debtors' business operations and instantly destroying the success of the Chapter 11 Process and the Sale Transaction. Consequently, the Debtors strongly believe that it is critical that they be permitted to pay their employees their pre-petition wages and continue with their ordinary course employee compensation and benefits policies, programs and procedures that were in effect prior to the Petition Date.

*vii.*     *Motion for Authority to Honor Customer Programs*

62. Pursuant to this motion, the Debtors seek authority to continue honoring their marketing, sales and promotional practices, which are targeted to develop and sustain positive reputations for their retail establishments in the marketplace (the "Customer Programs"). Although, in consultation with their advisors, the Debtors have concluded and believe that most of the Customer Programs constitute "ordinary course of business" practices and do not require court approval, out of an abundance of caution, the Debtors seek authority from the Court to honor their pre-petition Customer Programs in the ordinary course of business.

63.     The Debtors believe that immediate entry of an order approving the Debtors' ability to continue to honor their Customer Programs is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Thousands of customers frequent the Debtors' retail locations each week.  The success and viability of the Debtors' businesses are dependent upon the loyalty and confidence of their customers.  The continued support of this constituency is absolutely essential to the success of these cases.  Any delay in honoring the various Customer Programs or discontinuation of Customer Programs as a result of the commencement of these cases will severely and irreparably impair the Debtors' customer relations at a time when the loyalty and support of those customers is extremely critical.

64.     By contrast, honoring these pre-petition obligations will require minimal expenditure of estate funds and will assist the Debtors in preserving customer relationships for the benefit of all stakeholders.  The Debtors anticipate that any cost of continuation of the Customer Programs will be satisfied primarily (if not exclusively) by the customers' continued patronage of the Debtors' retail locations, rather than by payment from the Debtors' estates.  Accordingly, to preserve the value of their estates, the Debtors must be permitted, in the Debtors' sole discretion, to continue honoring the Customer Programs without interruption or modification.

*viii.*     *Motion for Authority to Pay Critical Vendor Claims and Claims Arising Under Bankruptcy Code Section 503(b)(9)*

65.     By this motion, and in order to obtain and ensure timely delivery from their suppliers and trade vendors, and to help ensure that the Debtors have access to post-petition trade credit from the suppliers of these vital goods, the Debtors seek entry of an order authorizing, but not directing, payment in the ordinary course of pre-petition claims of suppliers and vendors that are either essential to the continued operation of the Debtors' business and/or

entitled to administrative priority under Bankruptcy Code sections 503(b)(9) and 507(a)(2) (such suppliers and vendors together, the "Critical Vendors" and "Priority Vendors," respectively). The Debtors request that they be permitted, in the exercise of their sound business judgment, to pay those undisputed obligations arising from goods received by the Debtors from the Priority Vendors in the ordinary course of business within twenty (20) days before the Petition Date (such administrative expense claims, "Priority Vendor Claims") and that the Debtors be permitted to pay the prepetition claims of the Critical Vendors (the "Critical Vendor Claims") to ensure that the Critical Vendors continue to provide goods and services to the Debtors following the Petition Date.

66.     The Critical Vendors provide Critical Goods, which are generally branded goods that the Debtors' customers expect to be available for purchase in their retail stores, and Critical Services, which are services essential to the continued function of the Debtors' stores. In most instances, either due to the unique nature of the Critical Goods and/or the nature of the goods or service provided to the Debtors, the Debtors have no alternative providers for the Critical Goods and Critical Services. The failure to obtain the Critical Goods and Critical Services would result in a certain, negative impact on the Debtors' customer loyalty and sales revenue. Accordingly, the continued supply of the Critical Goods and Critical Services to the Debtors are essential to the success of these chapter 11 cases. The Debtors believe that the Critical Vendors will refuse to continue transacting with the Debtors absent payment of their prepetition claims. Similarly, if the Priority Vendors are not paid in the ordinary course on account of their Priority Claims, such Priority Vendors may not provide the Debtors with post-petition trade credit and may refuse to continue providing the Debtors with goods and services after the Petition Date.

67.     I believe that the relief requested in this motion will benefit the Debtors on

two fronts.  First, because the Debtors' business is dependent on access to a specific mix of

branded beauty and hair care products, maintaining the continuous flow of these products to the

Debtors will result in retaining customer traffic and loyalty and sustain the Debtors' sales results.

If the Debtors were denied the Critical Goods and Critical Services, it would be impossible to

find immediate replacements, and the decline in sales and business performance while the

Debtors attempted to find replacement vendors would result in immediate, significant and likely

irreparable damage.  Second, the Debtors' contemplate that the holders of Vendor Claims will

not be paid their Vendor Claims unless they agree to continue to provide the Debtors with

Customary Trade Terms, which will avoid liquidity constraints that the Debtors would face if

trade credit was restricted or outright denied.

68.     It is critical to the survival of the Debtors that they continue to receive the

goods from the Critical Vendors and Priority Vendors in the immediate future on an

uninterrupted basis as well as throughout the Chapter 11 Process.  The Debtors believe that

without the relief requested in this motion, many Priority Vendors may cease delivering goods to

the Debtors, which could have devastating consequences for the Chapter 11 Process.

*ix.*     *Motion Confirming Administrative Expense Status for Certain Vendors*

69.     By this motion, the Debtors seek entry of an order confirming that

merchandise, equipment, supplies, products and related items delivered post-petition or services

provided post-petition are granted administrative status.  Many of the Debtors' vendors and

suppliers will be unfamiliar with their rights under the Bankruptcy Code.  These creditors may be

concerned that delivery of goods or provision of services post-petition pursuant to outstanding

purchase orders will render such vendors unsecured pre-petition creditors of the Debtors' estates.

Accordingly, the Debtors request that the Court enter an order confirming the administrative priority status of goods and services delivered post-petition. In the absence of the relief requested, the vendors may require the Debtors to reissue outstanding purchase orders before delivering goods and providing services post-petition, resulting in delays and creating unnecessary demands on the Debtors' resources in the immediate period after the Petition Date. Granting the relief requested in the motion will provide the necessary assurances to the vendors and avoid the administrative burden on the Debtors of having to reissue or resubmit hundreds, if not thousands, of purchase orders.

x.       *Motion to Authorize Payment to Common Carriers*

70.       By this Motion, the Debtors seek authority, but not direction, to pay certain prepetition claims held by common carriers in amounts the Debtors determine necessary or appropriate to (i) obtain releases of critical or valuable goods that may be subject to liens, (ii) maintain a reliable, efficient and smooth distribution system, and/or (iii) induce critical common carriers to continue to carry goods and make timely deliveries thereof.

71.       The Debtors currently own and operate 612 store locations in shopping or strip malls throughout the United States and Puerto Rico that provide retail and salon services. A significant amount of the Debtors' inventory is sourced through a warehouse the Debtors share with Regis, and the inventory in this warehouse is distributed by Regis to the Debtors' stores pursuant to the warehousing agreement with Regis. However, the Debtors' remaining inventory is drop-shipped directly to the Debtors' stores, and the Debtors rely on the use of reputable common carriers, freight-forwarders, parcel carriers, and non-asset based carriers (brokers) for the timely transport and delivery of these goods and inventory.

72.     As a result, in the ordinary course of business, certain common carriers regularly have possession of goods and inventory destined for the Debtors' retail shelves and, ultimately, to the Debtors' customers.  The Debtors expect that, as of the Petition Date, certain of these common carriers will have outstanding invoices for goods that were delivered to the Debtors prior to the Petition Date, as well as goods in transit as of the Petition Date.

73.     It is essential for the Debtors' business operations and efforts to maximize the value of their assets that the Debtors maintain a reliable and efficient distribution network. Because the Debtors rely exclusively on goods and inventory produced by third parties which are ultimately sold to their customers, it is essential that their bankruptcy cases not be a reason or excuse for the common carriers to cease timely delivery or to retain goods and inventory in their possession on account of unpaid prepetition claims.  If the Debtors are unable to receive deliveries on a timely and uninterrupted basis, the Debtors will likely suffer, at a minimum, a significant loss of customer goodwill as well as revenue, thereby causing substantial and potentially irreparable harm to their businesses and efforts to maximize the value of their assets for the benefit of stakeholders.

74.     For the foregoing reasons, as discussed in greater detail in the motion, I believe the relief sought in this motion is in the best interests of the estates and all parties in interest.

    xi.     *Motion to Honor Outstanding Insurance Policy Obligations*

75.     The Debtors request the entry of an order authorizing the Debtors to: (a) continue to maintain and administer their insurance policies and revise, extend, renew, supplement or change such policies, as needed, (b) pay or honor obligations outstanding on account of the insurance policies in the ordinary course of business, and (c) continue to maintain

the Debtors premium financing agreement and revise, extend, renew, supplement or change such agreement, as needed, in each case in the ordinary course of business consistent with past practice. In the ordinary course of the Debtors' business operations, the Debtors maintain various insurance policies through several different insurance providers providing coverage for, inter alia: general liability, directors' and officers' liability, property, automobile, and umbrella liability.

76.     It is my understanding that in 2009, the Debtors paid an aggregate amount of approximately $800,000 in premiums on account of the insurance policies. I believe that continuation of the Debtors' insurance policies is essential to the preservation of the Debtors' businesses, property and assets, and, in many cases, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business conduct.

77.     Because it is not always economically advantageous for the Debtors to pay premiums at the inception of the insurance policies, the Debtors have certain insurance policies that are paid in installments with no financing charges, plus one insurance policy that they finance pursuant to a premium financing agreement with a third-party lender. Because of the importance of maintaining insurance coverage with respect to their business activities and preserving the Debtors' liquidity by financing certain insurance premiums, I believe it is in the Debtors' best interests to honor their obligations under these insurance policies, and the premium financing agreement, and to renew such agreement, and to enter into a new agreement as necessary.

78.     In light of the importance of maintaining insurance coverage with respect to their business activities, I believe it is in the best interests of the Debtors' estates to maintain the insurance policies and to pay any prepetition premiums necessary to do so, as well as to

revise, extend, supplement, or change insurance coverage,  Accordingly, on behalf of the

Debtors, I respectfully submit that the Insurance Motion should be approved.

    *xii.*       *Cash Collateral Motion*

       79.    Pursuant to the Cash Collateral Motion, the Debtors seek:  (a) authority

pursuant to sections 105(a), 361, 362, 363, 364 and 552 of the Bankruptcy Code for use of Cash

Collateral pursuant to the terms of the Interim Order attached to the Cash Collateral Motion; (b)

to grant to Regis adequate protection in respect of its interests in the Prepetition Collateral and

for claims arising from the diminution of value of Regis' collateral from the Debtors' use of the

Cash Collateral, and (c) a final hearing on the Cash Collateral motion.  As described below, I

believe the relief sought in the Cash Collateral Motion is essential and in the best interests of the

Debtors' estates.

       80.    The use of Cash Collateral on an interim basis is necessary to avoid

immediate and irreparable harm to the Debtors pending a final hearing.  Such use of Cash

Collateral has been negotiated in good faith and at arm's length among the Debtors and Regis.

Regis has consented to the Debtors' use of Cash Collateral in the ordinary course of business

pursuant to terms detailed in the Cash Collateral Motion and as provided in the Interim Order

attached thereto in exchange for the Debtors providing adequate protection against any

diminution in value of Regis's interests in its collateral.  The Debtors have agreed to provide

Regis with various forms of adequate protection.  As more completely set forth in the Cash

Collateral Motion, the Debtors will provide Regis with the following adequate protection:  (a)

the Replacement Lien; (b) the Superpriority Claim; and (c) certain reporting requirements.

81.     The Debtors have in good faith prepared a sixteen-week rolling cash flow budget acceptable to Regis and have agreed to limit expenditures in accordance with the budget, measured on a cumulative basis and with a permitted variance of 10%.

82.     I believe that the relief sought in the Cash Collateral Motion is essential for the Debtors to be able to finance their ongoing operations during the Chapter 11 Cases and is critical to the Debtors' successful reorganization.

**G.     Conclusion**

83.     In conclusion, for the reasons stated herein and in each of the First Day Papers filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Papers be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Dated: July 6, 2010

*/s/ Brian Luborsky*
Brian Luborsky
Chief Executive Officer
Trade Secret, Inc.

# EXHIBIT A

**Corporate Organization Chart**

**Trade Secret Group**

**Corporate Organization Chart**

Luborsky
Family Trust II
2009

(Alberta, CA)

Premier Salons Beauty Inc.
EIN 26-4119717
(Delaware, USA)

Trade Secret, Inc
EIN 84-0811292
(Colorado, USA)

Premier Salons Trade Secret, Inc.
EIN 27-13990005
(Delaware, USA )

Trade Secret Luxury
Stores Inc.
EIN 26-4119865
(Delaware, USA)

Trade Secret Exclusive Stores
Inc.
EIN 26-4119902
(Delaware, USA)

Trade Secret Beauty
Stores Inc.
EIN 26-4119804
(Delaware, USA)

Beauty First, Inc.
EIN 48-0951954
(Kansas, USA)

Pure Beauty, Inc.
EIN 98-0494358
(Delaware, USA)