# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRADE SECRET, INC., *et al.* [1] | Case No. 10-12153 (___) |
| Debtors. | (Joint Administration Requested) |
| | **Bidding Procedures Hearing Date: TBD**<br>**Bidding Procedures Objection Deadline: TBD**<br>**Sale Hearing Date: TBD**<br>**Sale Objection Deadline: TBD** |

**DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006 APPROVING PROCEDURES IN CONNECTION WITH SALE OF DEBTORS' ASSETS; (B) APPROVING FORM OF ASSET PURCHASE AGREEMENT; (C) SCHEDULING AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE; (D) APPROVING PROCEDURES RELATED TO ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (E) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (F) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING SALE OF SUCH ASSETS PURSUANT TO ASSET PURCHASE AGREEMENT, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES <u>RELATED THERETO; AND (C) GRANTING RELATED RELIEF</u>**

Trade Secret, Inc. and its affiliated debtors and debtors-in-possession in the

above-captioned cases (collectively, the "<u>Debtors</u>," and each individually, a "<u>Debtor</u>"), hereby

submit this motion (the "<u>Motion</u>") for entry of an order, pursuant to sections 105(a), 363 and 365

of title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et</u> <u>seq.</u> (the "<u>Bankruptcy Code</u>"), and

Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"),

(a)(i) approving certain bidding procedures (the "<u>Bidding Procedures</u>") in connection with the

Debtors' sale (the "<u>Sale</u>") of certain of assets (as described more fully below and in the Asset

---

[1] The Debtors in these cases, along with the last four (4) digits of their federal tax identification numbers (if applicable) are: Premier Salons Beauty Inc. (EIN XX-XXX9717); Trade Secret, Inc. (EIN XX-XXX1292); Premier Salons Trade Secret Inc. (EIN XX-XXX0005); BeautyFirst, Inc. (EIN XX-XXX1954); Trade Secret Beauty Stores Inc. (EIN XX-XXX9804); Trade Secret Exclusive Stores Inc. (EIN XX-XXX9902); Trade Secret Luxury Stores Inc. (EIN XX-XXX9865); PureBeauty, Inc. (EIN XX-XXX4358). The address for each Debtor is 3762 14th Avenue, #200, Markham, Ontario, L3R 0G7, Canada.

Purchase Agreement (defined below), the "<u>Acquired Assets</u>"), (ii) approving the form of the asset purchase agreement (the "<u>Asset Purchase Agreement</u>") in connection with the Sale, substantially in the form attached hereto as <u>Exhibit 3</u>,[2] by and between the Debtors and the Regis Corporation ("<u>Regis</u>" or "<u>Purchaser</u>")[3], (iii) scheduling an auction (the "<u>Auction</u>") in connection with, and hearing (the "<u>Sale Hearing</u>") to consider approval of, the Sale, (iv) approving certain procedures (the "<u>Cure Procedures</u>") related to the assumption of certain executory contracts and unexpired leases, (v) approving the form and manner of notice with respect to the foregoing and (vi) granting certain related relief, and (b)(i) authorizing the Sale pursuant to the Asset Purchase Agreement free and clear of any and all liens, claims, encumbrances and other interests to the Purchaser or the party otherwise submitting the highest and best offer at the Auction (the "<u>Successful Bidder</u>"), (ii) approving the assumption and assignment of the executory contracts and unexpired leases (collectively, the "<u>Assumed Contracts</u>") related thereto, and (iii) granting certain relief in connection therewith.

## BACKGROUND AND JURISDICTION

1.        On July 6, 2010 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.        The Debtors continue to operate their businesses and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.        An official committee (a "<u>Committee</u>") has not yet been established in these cases. No request has been made for the appointment of a trustee or examiner.

---

[2]     As of the Petition Date, the Debtors and the Purchaser formalized a term sheet (the "<u>Term Sheet</u>") with respect to the Sale, a copy of which is included herewith as <u>Exhibit 3</u>. It is the Debtors' expectation that the Asset Purchase Agreement with respect to the proposed Sale to the Purchaser will be finalized and filed in the coming days, but in any event, not later than the hearing to consider the Bidding Procedures.

[3]     As discussed more fully below, Regis Corporation will assign its rights under the Asset Purchase Agreement to a newly formed affiliate of the Luborsky Family Trust II 2009 ("<u>LFT II</u>"), an insider of the Debtors.

        

4.      Information regarding the Debtors' history and business operations, their capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases can be found in the Declaration of Brian Luborsky in Support of Chapter 11 Petitions and First Day Relief, which is incorporated herein by reference.

5.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, along with Bankruptcy Rules 6004 and 6006.

## RELIEF REQUESTED

6.      By this Motion, the Debtors seek entry of an order, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006: (a) approving (i) the Bidding Procedures, a copy of which is attached as Exhibit A to the proposed order annexed hereto as Exhibit 1 (the "Bidding Procedures Order"); (ii) the notice of the Auction and Sale Hearing (the "Auction and Sale Notice"), substantially in the form attached as Exhibit B to the Bidding Procedures Order; (iii) the publication notice of the Auction and Sale Hearing (the "Publication Notice"); and (iv) the notice (the "Assumption and Assignment Notice"), substantially in the form attached as Exhibit D to the Bidding Procedures Order, of the Debtors' proposed assumption and assignment of the Assumed Contracts; (b) approving the Expense Reimbursement for the benefit of Regis and Debtors' estates; (c) approving the form of Asset Purchase Agreement; (d) establishing a date that is no later than August 20, 2010 at 4:00 p.m. (Eastern Time) as the deadline for the submission of bids (the "Bid Deadline"); (e) scheduling the Auction, if necessary, no later than August 25, 2010; (f) scheduling the Sale

3

Hearing for no later than September 1, 2010 to consider the sale of the Acquired Assets to the Purchaser or the Successful Bidder; and (g) granting certain other related relief.

7.     The Debtors further request the Court to enter an order at the Sale Hearing, substantially in the form attached hereto as Exhibit 2 (the "Sale Order"): (a) approving a sale to the Purchaser pursuant to the Asset Purchase Agreement, or to the Successful Bidder pursuant to a purchase and sale agreement substantially in the form of the Asset Purchase Agreement; (b) approving the Asset Purchase Agreement, or a substantially similar asset purchase agreement applicable to the Purchaser or the Successful Bidder; and (c) authorizing the Debtors (i) to sell the Acquired Assets, free and clear of any and all liens, claims, encumbrances and interests (other than certain specified assumed liabilities) and (ii) to assume and assign to the Purchaser the Assumed Contracts.

## A.     Proposed Stalking Horse and Bidding Protections Provided Thereto

8.     Prior to the Petition Date, the Debtors, their management and professionals approached Regis – their secured lender – to determine Regis' interest in acting as a stalking horse bidder with respect to a sale of substantially all of the Debtors' assets.  It was the view of the Debtors' management that Regis was the most likely candidate to successfully act as the stalking horse bidder with respect to any sale of substantially all of the Debtors' assets given Regis' history with, and recent sale of, the Trade Secret Group to PSBI, the business synergies currently in place by and among Regis and Trade Secret Group, Regis' overall place in the competitive market in which the Debtors' operate, and Regis' secured position with respect to substantially all, if not all, of the Debtors' assets.  In mid- to late-June 2010, Regis confirmed its desire to act as the stalking horse bidder with respect to a sale of substantially all of the Debtors' assets and, shortly thereafter, the parties negotiated and agreed to a term sheet (the "Term

4

Sheet") for the sale of substantially all of the Debtors' assets to a joint venture of Regis and a newly formed affiliate of LFT II (an insider of the Debtors) for a combined purchase price of (i) $32 million representing a credit bid from Regis, and (ii) assumption of liabilities anticipated to be approximately $13 million, for a total purchase price of $45 million. The Term Sheet is presently being reduced to a formal Asset Purchase Agreement (the "APA"). Pursuant to the Term Sheet and APA, Regis' rights under the APA will be assigned to a newly formed affiliate of LFT II which intends to continue the Trade Secret Group's operations, as a scaled down operation that eliminates unprofitable stores, and will continue to employ a substantial number of the Debtors' existing employees.

9. As part of the Bidding Procedures Order, the Debtors are requesting approval of certain provisions regarding the payment of the Expense Reimbursement, pursuant to the terms and conditions set forth in the Asset Purchase Agreement. Regis is not willing to serve as a stalking horse bidder without the approval of the Expense Reimbursement. If approved by this Court, the Debtors would be required to pay Regis the Expense Reimbursement, in an amount up to $100,000 as required by, and set forth more fully in, the Asset Purchase Agreement.[4]

**B.** **Proposed Notice of the Sale Hearing**

10. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with twenty-one (21) days notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested in the Motion. The Debtors

---

[4] LFT II has not requested any expense reimbursement or stalking horse protections related to its role in the proposed Sale.

propose that the deadline for objecting to approval of the Sale shall be no later than August 20, 2010 at 4:00 p.m. (Eastern Time) (the "Sale Objection Deadline").

11.     Additionally, upon entry of the Bidding Procedures Order, the Debtors propose to, not later than three (3) days thereafter, serve notice of the Bidding Procedures Order and the Auction and Sale Hearing, in substantially the form of the Auction and Sale Notice, on (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to Regis; (c) counsel to LFT II: (d) the parties included on the Debtors' consolidated list of twenty (20) creditors holding the largest unsecured claims; (e) any party which, to the best of the Debtors' knowledge, information and belief, has, in the past year, expressed in writing to the Debtors an interest in buying their business and which the Debtors and their representatives reasonably and in good faith determine potentially have the financial wherewithal to effectuate the transactions contemplated by the Motion; (f) all parties which, to the best of the Debtors' knowledge, information and belief, have asserted a lien or security interest against any of the Acquired Assets; (g) all taxing authorities or recording offices which have a reasonably known interest in relief requested in the Motion; and (h) all parties requesting notice pursuant to Rule 2002-1(b) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (collectively, the "Bidding Procedures Notice Parties").

12.     The Debtors further propose (a) to provide electronic notification of the Bidding Procedures Order and the Auction and Sale Hearing to interested parties by filing a copy of the Auction and Sale Notice with the Court, and (b) to within seven days after entry of the Bidding Procedures Order, or as soon as practicable thereafter, submit for publication a notice,

6

substantially in the form attached to the Bidding Procedures Order as Exhibit C (the "<u>Publication Notice</u>"), to be submitted for publication once in the national edition of <u>The New York Times</u>.

13.     The Debtors submit that the foregoing notice procedures satisfy Bankruptcy Rule 2002 and Local Rule 2002-1(b) and provide adequate and sufficient notice of the Sale and related deadlines, including, without limitation, the Bid Deadline and Sale Objection Deadline.

## C.     <u>Proposed Cure Procedures</u>

14.     As part of the Sale, the Debtors may assume and assign to the Purchaser certain Assumed Contracts.  As soon as practicable, but no later than five (5) days after entry of the Bidding Procedures Order, the Debtors will file and serve the Assumption and Assignment Notice, which notice will include a schedule of cure obligations (the "<u>Cure Schedule</u>") for the Assumed Contracts to notify the counterparties thereto that such Assumed Contracts may be assumed and assigned.  The Cure Schedule will include a description of each Assumed Contract that may be assigned to the Purchaser or an alternative purchaser pursuant to the Asset Purchase Agreement, and the amount (the "<u>Cure Cost</u>"), if any, the Debtors believe is necessary to cure each such agreement pursuant to section 365 of the Bankruptcy Code.  A copy of the Assumption and Assignment Notice, together with the Cure Schedule, will be served on each of the non-Debtor parties to the Assumed Contracts on the date that the Assumption and Assignment Notice is filed with the Court.

15.     The Debtors propose that any objections by the non-Debtor parties to the assumption and assignment of the Assumed Contracts, including, but not limited to, objections relating to adequate assurance of future performance, or to the Cure Costs set forth on the Cure Schedule, must be in writing, filed with the Court and be actually received on or before August

11, 2010 at 4:00 p.m. (Eastern Time) by the following parties: (a) the Debtors, 3762 14th Avenue # 200, Markham, Ontario L3R 0G7, Canada (Attn: Brian G. Luborsky); (b) proposed counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19899 (Attn: Joseph M. Barry, Esquire and Kenneth J. Enos, Esquire); (c) Stoney Bridge Partners, Inc., 45 St. Clair Avenue West, Suite 1202, Toronto, ON M4V 1K9 Canada (Attn: Robert von der Porten and James Cook); (d) SSG Capital Advisors, LLC, Five Tower Bridge, 300 Barr Harbor Drive, Suite 420, West Conshohocken, PA 19428 (Attn: J. Scott Victor); (e) counsel to the Purchaser, Ravich Meyer Kirkman McGrath Nauman & Tansey, 4545 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402 (Attn: Michael L. Meyer); (f) once it is formed, counsel to any Committee; and (g) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: David L. Buchbinder, Esquire). Any such objection shall set forth a specific default in any Assumed Contracts and claim a specific monetary amount that differs from the Cure Cost, if any, specified in the Assumption and Assignment Notice and the Cure Schedule provided therein.

16. However, in the event that the Auction results in a Successful Bidder other than the Purchaser, the Debtors shall file a notice identifying such Successful Bidder, and serve such notice upon each non-Debtor party to the Assumed Contracts, and the deadline for objecting to the assignment of any Assumed Contracts to such Successful Bidder solely on the basis of adequate assurance of future performance (and not Cure Costs) will be 4:00 p.m. (ET) the day prior to the commencement of the Sale Hearing.

17. If no objections are received thereto, the Cure Cost set forth in the Cure Schedule will be binding upon the non-Debtor parties to Assumed Contracts for any and all

purposes in these Chapter 11 Cases, and will constitute a final determination of the total Cure Costs required to be paid in connection with the Debtors' assumption and assignment of any Assumed Contracts. Additionally, all non-Debtor parties to the Assumed Contracts will be: (a) forever barred from asserting any additional cure or other amounts with respect to the Assumed Contracts, and the Debtors and the Successful Bidder will be entitled to rely solely upon the Cure Costs set forth in the Assumption and Assignment Notice and the Cure Schedule included therein; (b) deemed to have consented to the Debtors' assumption and assignment of any Assumed Contracts; and (c) forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder (i) that any additional amounts are due or other defaults exist, (ii) that additional conditions to assumption and assignment must be satisfied by the Debtors or the Successful Bidder or (iii) that there is any objection or defense with respect to the assumption and assignment of such Assumed Contracts.

18.     In the event a non-Debtor party to an Assumed Contract files an objection asserting a cure amount under section 365 of the Bankruptcy Code higher than the proposed Cure Cost (a "Cure Objection"), then (a) to the extent that the parties are able to consensually resolve the Cure Objection prior to the Sale Hearing, the Debtors shall promptly provide any Committee and the Successful Bidder notice and an opportunity to object to such proposed resolution, or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid under section 365 of the Bankruptcy Code with respect to such Cure Objection will be determined at the Sale Hearing or at such other date and time as may be fixed by the Court. All objections to the proposed assumption and assignment of Assumed Contracts that are not Cure Objections will be heard at the Sale Hearing, to the extent the Debtors are unable to resolve any of these objections in advance of such hearing.

YCST01:9726428.8                                    069219.1001

**D.**     **Compliance with Local Rule 6004-1 Highlighting Requirements**

19.     Local Rule 6004-1 states that the Sale Motion "must highlight material terms, including but not limited to (a) whether the proposed form of sale order and/or the underlying purchase agreement constitutes a sale or contains certain highlighted provisions, (b) the location of any such provision in the proposed form of order or purchase agreement, and (c) the justification for the inclusion of any such provision." Local Rule 6004-1(b)(iv). In addition, "[a] debtor may file a Sale Procedures Motion seeking approval of an order . . . approving bidding and auction procedures either as part of the Sale Motion or by a separate motion filed in anticipation of an auction and a proposed sale." Local Rule 6004-1(c). Pursuant to Local Rule 6004-1(c)(i), the Sale Procedures Motion must highlight certain provisions contained in the Sale Procedures Order. Since the Debtors seek to have bid and auction procedures approved as part of the Sale Motion, the Debtors have highlighted the relevant provisions of both the Asset Purchase Agreement and the Bidding Procedures below, in accordance with Local Rule 6004-1. In recognition of the non-exclusive nature of the lists provided in Rule 6004-1(b)(iv) and (c)(i), and although not explicitly referenced therein, the Debtors also highlight additional material terms of the Asset Purchase Agreement and the Bidding Procedures for the Court's convenience[5].

**E.**     **Bidding Procedures**

20.     The material terms of the Bid Procedures are as follows:[6]

a.     **Assets For Sale.** The Debtors are offering for sale in one or more transactions all or substantially all of their assets. The Asset Purchase Agreement contains a more detailed description of the Acquired Assets.

---

[5]     Upon completion of the Asset Purchase Agreement, the Debtors will supplement this Motion to the extent provisions in the Asset Purchase Agreement are required to be highlighted pursuant to Local Rule 6004-1.

[6]     To the extent any inconsistencies exist between the summary provided in this Motion and the actual terms of the Bidding Procedures, the Bidding Procedures shall control. Capitalized terms used but not otherwise defined in connection with this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

b.  **Proposed Purchaser.**  Regis Corporation (the "Purchaser") has submitted the Asset Purchase Agreement which provides for the purchase of the Acquired Assets pursuant to the terms of the Asset Purchase Agreement in exchange for the consideration equal to that contained in the Purchase Price section of the Asset Purchase Agreement.

c.  **Qualified Bids and Qualified Bidders**

i.  *Obligation to Deliver Financial Information to Debtors.* Each Potential Bidder and Qualified Bidder (collectively, a "Bidder") shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction.  Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder.  Failure by a Qualified Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Qualified Bid.

ii.  *Proof of Financial Ability to Perform.*  Within ten (10) days prior to the Bid Deadline, written evidence that the Debtors reasonably conclude demonstrates the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction.  Such information should include, inter alia, the following:  (i) the Potential Bidder's current financial statements (audited if they exist); (ii) contact names and numbers for verification of financing sources; (iii) evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and (iv) any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated transaction; provided, however, that the Debtors shall determine, in their reasonable discretion, in consultation with their advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Potential Bidder's financial qualifications.

iii.  *Corporate Authority.*  Within ten (10) days prior to the Bid Deadline (defined below), written evidence of the Potential Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; provided, however, that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction, then the Potential Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder (the "Principals");

11

iv.     *Maintain confidentiality*.  To participate in the bidding process or to otherwise be considered for any purpose hereunder, a person interested in all or portions of the Acquired Assets (a "Potential Bidder") must first deliver (unless previously delivered) to the Debtors, their counsel, and counsel to any official committee appointed in these chapter 11 cases (a "Committee"), not later than ten (10) days from entry of the Bidding Procedures Order (i) an executed confidentiality agreement in form and substance acceptable to the Debtors and their counsel; and (ii) identify the Potential Bidder and any Principals (defined in the Bidding Procedures), and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction.

v.     *Bid Deadline*.  The deadline for submitting bids by a Qualified Bidder shall be August 20, 2010 at 4:00 p.m. (ET).  A Bid received after the Bid Deadline shall not constitute a Qualified Bid (unless the Bid Deadline is extended by the Debtors in their sole discretion).

vi.     *Form of Bid*.  The Bid must be on terms that, in the Debtors' business judgment are substantially the same or better than the terms of the Asset Purchase Agreement.   A Bid must include executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "Contemplated Transaction Documents").  A Bid shall include a copy of the Asset Purchase Agreement marked to show all changes requested by the Bidder (including those related to Purchase Price).  The Contemplated Transaction Documents must include a commitment to close by the Termination Date (as defined below).  A Bid should propose a contemplated transaction involving all of the Acquired Assets, but the Debtors will consider proposals for less than substantially all the Acquired Assets, provided that the Debtors may evaluate all Bids, in their sole discretion, to determine whether such Bid maximizes the value of the Debtors' estates as a whole.

vii.     *Irrevocable Bid*.  A Bid must be irrevocable until two (2) business days after the Acquired Assets have been sold pursuant to the Closing of the sale or sales approved by the Bankruptcy Court (the "Termination Date").

viii.     *Good Faith Deposit*.  Each Bid must be accompanied by a deposit (the "Good Faith Deposit") in the form of a certified check or cash payable to the order of the Debtors in an amount equal to ten (10) percent of such Bid.

YCST01:9726428.8                                                                                                           069219.1001

d. **Bidding Process**. The Debtors and their advisors, shall: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions above; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Acquired Assets (collectively, the "Bidding Process"). The Debtors shall have the right to adopt such other rules for the Bidding Process (including rules that may depart from those set forth herein) that will better promote the goals of the Bidding Process and that are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

e. **Access to Due Diligence Materials**. After entry of the Bidding Procedures Order, only Potential Bidders that comply with the Participation Requirements are eligible to receive due diligence access or additional non-public information. If the Debtors determine that a Potential Bidder that has satisfied the Participation Requirements does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due diligence access or additional non-public information shall terminate. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as hereinafter defined). The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Acquired Assets.

f. **Due Diligence From Bidders**. Each Potential Bidder and Qualified Bidder (collectively, a "Bidder") shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction. Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Qualified Bid

g. **Auction**. Only if a Qualified Bid (other than the Purchaser's) is received by the Bid Deadline, shall the Debtors conduct an auction (the "Auction") to determine the highest and best bid with respect to the Acquired Assets. The Debtors shall provide the Purchaser and all Qualified Bidders with copies of all Qualified Bids at least twenty-four (24) hours prior to any Auction. The Auction shall commence on August 25, 2010 at 10:00 a.m. (ET) at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, and any changes to the time and location of the Auction will either be filed with the Court or announced at the Auction. The Auction will be conducted openly and all creditors will be permitted to attend.

YCST01:9726428.8                                                                                    069219.1001

No later than the commencement of the Auction, the Debtors will notify all Qualified Bidders of (i) the highest, best and otherwise financially superior Qualified Bid, as determined in the Debtors' discretion (the "Baseline Bid") and (ii) the time and place of the Auction, and provide copies of all submitted bids to all Qualified Bidders (if the Purchaser's Qualified Bid constitutes the Baseline Bid then the Expense Reimbursement shall be added to the Qualified Bid for purposes of the Auction).

If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, the Purchaser will be the Successful Bidder, the Agreement will be the Successful Bid, and, at the Sale Hearing, the Debtors will seek approval of and authority to consummate the Proposed Sale contemplated by the Agreement.

h.    **Bidding Increments and Auction Procedures**.    Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction.  Only the authorized representative of each of the Qualified Bidders, the Committee, and the Debtors shall be permitted to participate.  Each Qualified Bidder will be required to confirm that it has not engaged in any collusion with respect to the Auction or the Proposed Sale.  During the Auction, bidding shall begin initially with the highest Baseline Bid and subsequently continue in minimum increments of at least $500,000.  Other than otherwise set forth herein, the Debtors may conduct the Auction in the manner they determine will result in the highest, best or otherwise financially superior offer for the Acquired Assets.

An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid.  To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions: (i) Any Overbid after the Baseline Bid shall be made in increments of at least $500,000.  Additional consideration in excess of the amount set forth in the Baseline Bid may include only cash; provided, however, that notwithstanding the foregoing, any Overbid by the Purchaser may be a credit bid under section 363(k) of the Bankruptcy Code, either in full or in part; (ii) Except as modified in the Bidding Procedures, an Overbid must comply with the conditions for a Qualified Bid set forth therein, provided, however, that the Bid Deadline and the Initial Minimum Overbid Increment shall not apply.  Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (i) the Debtors accept a higher Qualified Bid as an Overbid and (ii) such Overbid is not selected as the Back-up Bid (as defined in the Bidding Procedures).

i.    **Acceptance of Successful Bid.**  The Debtors shall sell the Acquired Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing.  The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the bid.  The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Bankruptcy Court at the Sale Hearing.  All interested parties reserve their right to object to the Debtors' selection of the Successful Bidder (including the assignment of any of such objector's Assumed Contract (as defined in the Bidding Procedures Order) thereto, provided, however, that any objection to such assignment on the basis of the Cure Cost (as defined in the Bidding Procedures Order) must be made and/or reserved as set forth in the order

14

approving these Bidding Procedures).

    j.  **Modifications of Bidding Procedures.** The Bidding Procedures may not be modified except with the express written consent of the Debtors and the Purchaser. The Debtors, may (a) determine, which Qualified Bid, if any, is the highest, best or otherwise financially superior offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors.

    k.  **Sale Hearing.** The Sale Hearing shall be conducted by the Bankruptcy Court on a day that is one (1) business day following the Auction Date or on such date as may be established by the Bankruptcy Court. Following the approval of the sale of the Acquired Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fail to consummate an approved sale within twenty (20) days after entry of an Order approving the Sale, the Debtors shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Bid without further order of the Bankruptcy Court.

    l.  **Bid Protections for Stalking Horse** As part of the Bidding Procedures Order, the Debtors are requesting approval of certain provisions regarding the payment of the Expense Reimbursement, pursuant to the terms and conditions set forth in the Asset Purchase Agreement. The Purchaser is not willing to serve as a stalking horse bidder without the approval of the Expense Reimbursement. If approved by this Court, the Debtors would be required to pay the Purchaser the Expense Reimbursement, in an amount up to $100,000 as required by, and set forth more fully in, the Asset Purchase Agreement.

    m.  **Closing with Alternative Backup Bidders.** If the Auction is conducted, the Back-up Bidder shall keep the Back-up Bid open and irrevocable until 5:00 p.m. (ET) on the first business day following the Closing of the Sale with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-up Bidder's bid will be deemed to be the new Successful Bid, and the Debtors will be authorized, but not required, to consummate the sale with the Back-up Bidder without further order of the Court upon at least 24 hours' notice to the Bidding Notice Parties. In such case, the Successful Bidder's deposit shall be forfeited to the Debtors as damages and the Debtors specifically reserve all right to seek all available damages from the defaulting Successful Bidder.

YCST01:9726428.8                          069219.1001

## F.    **Proposed Sale to Purchaser**

21.    Shortly after the Petition Date, the Debtors and Purchaser will enter into the Asset Purchase Agreement, subject to this Court's approval as well as a higher and better offers for the Acquired Assets.  Below is a summary of the material provisions of the Asset Purchase Agreement.[7]

a.    **Purchase Price**.  $32 million through credit bid of the Purchaser's secured claim, plus the assumption of the Assumed Liabilities (defined below), believed to be approximately $13 million.

b.    **Assignee.**  A newly formed affiliate of the Luborsky Family Trust II 2009, an insider of the Debtors.

c.    **Acquired Assets**.  "Acquired Assets" includes, but is not limited to the following: (i) all cash in bank accounts and all register cash at the Purchased Stores; provided, that Purchaser shall only acquire aggregate cash in excess of the Wind-down Reserve; (ii) all accounts receivable, rebates, refunds and other receivables; (iii) all inventory; (iv) all deposits; (v) leases for all Purchased Stores; (vi) furniture, fixtures and equipment at all Purchased Stores; (vii) all intellectual property; (viii) all assigned contracts designated by the Purchaser; (ix) all information technology systems, equipment and software; (x) all insurance policies; (xi) all causes of action of the Company arising out of operating the Company's business; (xii) all actions arising under chapter 5 of the Bankruptcy Code that could be asserted against counterparties to the assigned contracts, all landlords for the Purchased Stores, all parties employed (including officers and directors of the Company) by Purchaser in operating the Company's business after the Closing, all vendors used by Purchaser in operating the Company's business after the Closing; and (xiii) all goodwill and other intangible assets associated with the Acquired Assets or the Business.

d.    **Purchased Stores/Designation Rights**.  Upon entry into a definitive agreement for the Sale, Purchaser shall designate those stores which shall be Purchased Stores.  The leases for such stores shall be the "Initial Purchased Store Leases."

Purchaser shall also designate those stores for which it shall have until the date which is sixty (60) days after the Closing (the "Outside Designation Date") to designate such stores as Purchased Stores (each a "Designation Store").  The leases for such stores shall be the "Initial Designation Store Leases."  Purchaser shall bear the cost of operating each Designation Store from the Closing until the earlier of (i) the date that the lease underlying the Designation Store is terminated or rejected pursuant to a bankruptcy court

---

[7]    This summary is provided merely for the Court's convenience.  To the extent any inconsistencies exist between the summary provided in this Motion and the actual terms of the Asset Purchase Agreement, the Asset Purchase Agreement shall control.  Capitalized terms used but not otherwise defined in connection with this summary shall have the meanings ascribed to such terms in the Assets Purchase Agreement.

order, (ii) the date that is fifteen (15) days after Purchaser gives written notice that it does not intend to designate a Designation Store as a Purchased Store, and (iii) the Outside Designation Date.

  e. **Assumed Liabilities**. "Assumed Liabilities" include, but are not limited to, the following: (i) all cure amounts associated with the assigned contracts; (ii) all cure amounts for the real property leases underlying each Purchased Store; (iii) all obligations under the assigned contracts and the real property leases underlying each Purchased Store arising from and after the Closing; (iv) all ordinary course liabilities and obligations of the Business arising on and after the Petition Date through the Closing; (v) all ordinary course compensation liabilities or obligations related to the employees of the Business, including accrued paid time off and severance (without regard to whether such employees remain employed by the Business after the Closing) and accrued gross payroll liabilities and obligations (including payroll taxes accrued but unpaid); (vi) obligations and liabilities to certain critical or priority vendors identified by Purchaser at the time of entry into a definitive agreement for the Sale; (vii) all obligations and liabilities arising under customer programs existing as of the Closing, without regard to the date upon which such obligations or liabilities arose; (viii) all trust fund taxes relating to any obligations arising or occurring from the operation of the Business prior to the Closing; (ix) All tax obligations of the Business entitled to priority under 11 U.S.C. § 507; and (x) All timely asserted claims for goods sold that are entitled to administrative expense status under 11 U.S.C. § 503(b)(9).

  f. **Expense Reimbursement**. As part of the Bidding Procedures Order, the Debtors are requesting approval of certain provisions regarding the payment of the Expense Reimbursement, pursuant to the terms and conditions set forth in the Asset Purchase Agreement. The Purchaser is not willing to serve as a stalking horse bidder without the approval of the Expense Reimbursement. If approved by this Court, the Debtors would be required to pay the Purchaser the Expense Reimbursement, in an amount up to $100,000 as required by, and set forth more fully in, the Asset Purchase Agreement.

  g. **Sale of Avoidance Actions.** Included in the definition of "Acquired Assets" are all actions arising under chapter 5 of the Bankruptcy Code that could be asserted against counterparties to the assigned contracts, all landlords for the Purchased Stores, all parties employed (including officers and directors of the Company) by Purchaser in operating the Company's business after the Closing, all vendors used by Purchaser in operating the Company's business after the Closing.

  h. **General Release**. The Debtors anticipate granting a release to Regis, LFT II and certain other parties in connection with the Sale.

  i. **Credit Bid**. As set forth above, the Purchase Price is $32 million through a credit bid of the Purchaser's secured claim.

## BASIS FOR RELIEF REQUESTED

**A.    The Sale is Within the Sound Business Judgment
of the Debtors and Should be Approved**

22.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a

debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 363 of the

Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court

to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However,

courts in this Circuit and others have required that the decision to sell assets outside the ordinary

course of business be based upon the sound business judgment of the debtors.  See In re Abbotts

Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re

Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re

Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery

Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del.

1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

23.    The "sound business judgment" test requires a debtor to establish four

elements in order to justify the sale or lease of property outside the ordinary course of business,

namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary

course of business, (b) that adequate and reasonable notice has been provided to interested

persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith.

Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country

Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702,

704 (Bankr. E.D. Pa. 1989).  In this case, the Debtors submit that the decision to proceed with

the Sale and the Bidding Procedures related thereto are based upon their sound business

18

judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071.

24. Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

25. The Debtors submit that more than ample business justification exists to sell the Acquired Assets to the Purchaser (or the Successful Bidder) pursuant to the Bidding

Procedures.  The Debtors believe that the sale process proposed herein is most likely to achieve the highest and best price for the Acquired Assets.  As described more fully below, the relief requested in the First Day Papers was carefully tailored by the Debtors, in consultation with their advisors, to ensure that the Debtors' immediate operational needs are met and that the Debtors suffer no immediate and irreparable harm.  At all times the Debtors' management and advisors remained cognizant of the limitations imposed on debtors-in-possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these cases to those issues that require urgent relief to sustain the Debtors' immediate operability.  Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

26.     The Auction and Sale Notice, substantially in the form attached as Exhibit B to the Bidding Procedures Order, is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Acquired Assets.  Accordingly, the Sale satisfies the second prong of the Abbotts Dairies standard, as discussed below.

27.     Moreover, the Bidding Procedures are designed to maximize the value received for the Acquired Assets.  Under the facts and circumstances of these Chapter 11 Cases, the process proposed herein by the Debtors allows for a timely and efficient auction process, while providing bidders and consultants with ample time and information to submit a timely bid. The Bidding Procedures are designed to ensure that the Acquired Assets will be sold for the highest or otherwise best possible purchase price.  The Debtors are subjecting the value of the Acquired Assets to market testing and permitting prospective purchasers to bid on the assets. The Sale will be further subject to a market check through the solicitation of competing bids in a

YCST01:9726428.8                                                                                                                 069219.1001

Court-supervised auction process as set forth in the Bidding Procedures.  Therefore, the Debtors and all parties in interest can be assured that the consideration received for the Acquired Assets will be fair and reasonable, and therefore, the third prong of the <u>Abbotts Dairies</u> standard is satisfied.  As discussed below, the "good faith" prong of the <u>Abbotts Dairies</u> standard is also satisfied here.

**B.     The Expense Reimbursement Requested Herein**
**        is Reasonable and Should be Approved**

28.     Local Rule 6004-1(c)(i)(C) provides that a bidding procedures motion must highlight "[a]ny provisions providing an initial or 'stalking horse' bidder a form of bid protection."  L.R. Bankr. P. 6004-1(c)(i)(C).  The Debtors have complied by including herein the amount sought as an Expense Reimbursement by Regis.

29.     The Third Circuit has stated that an expense reimbursement may be approved when they provide some postpetition benefit to the debtor's estate.  <u>Calpine Corp. v. O'Brien Environmental Energy, Inc.</u> (<u>In re O'Brien Environmental Energy, Inc</u>.), 181 F.3d 527, 536 (3d Cir. 1999).  In <u>O'Brien</u>, the Third Circuit determined that a break-up fee provides an actual benefit to a debtor's estate in two circumstances.  First, where "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Second, when bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  <u>Id</u>. at 537.  <u>See</u> <u>In re Diamonds Plus, Inc.</u>, 233 B.R. 829, 831 (Bankr. E.D. Ark. 1999) ("A break-up fee is intended to compensate the unsuccessful bidder for fees and expenses in connection with the effort to complete the transaction."); <u>In re Wintz Companies</u>, 230 B.R. 840 (8th Cir.

21

BAP 1999), aff'd, 219 F.3d 807, 846 (8th Cir. 2000) (noting that break-up fees are permitted provided they create an incentive for higher bids).

        30.     The paramount goal in any proposed sale of property of a debtor is to maximize the proceeds received by the estate.  See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand."); In re Integrated Resources, Inc., 147 B.R. 659.  Courts recognize that procedures intended to enhance competitive bidding are consistent with this goal. See Id. (such procedures "encourage bidding and maximize the value of the debtor's assets"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) ("break-up fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking").

        31.     In O'Brien, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee and expense reimbursement:  (1) the presence of self-dealing or manipulation in negotiating the break-up fee and expense reimbursement; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee and expense reimbursement relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee and expense reimbursement "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of the break-up fee and expense reimbursement; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee and

expense reimbursement] on unsecured creditors, where such creditors are in opposition to the break-up fee." See In re O'Brien, 181 F.3d at 536.

32.     The Debtors submit that the foregoing factors are met under the facts and circumstances of these cases, as the proposed Expense Reimbursement is necessary to the success of the auction and sale process and therefore provides an actual benefit to the Debtors' estates.  Although Regis is the Debtors' secured creditor and Regis' assignee under the Asset Purchase Agreement is an insider of the Debtors, the Asset Purchase Agreement and the Expense Reimbursement are the result of arms' length, good faith negotiation between the parties. Indeed, the Asset Purchase Agreement and Expense Reimbursement were approved by the Debtors' independent board members without the participants of the insider assignee of Regis' rights under the Asset Purchase Agreement.  Regis was unwilling to enter into the Asset Purchase Agreement without the protection provided by the Expense Reimbursement, and the Auction contemplated hereby will initiate an overbid process at a floor price that is desirable for the Debtors, thereby increasing the likelihood that the sales price will represent the true worth of the Acquired Assets.

33.     By ensuring the existence of a "floor" purchase price under the Asset Purchase Agreement, the Expense Reimbursement will therefore induce bids that potentially may have never been made and without which bidding may be limited.  In sum, the Debtors' ability to provide the Expense Reimbursement enables them to ensure sales to contractually-committed bidders at prices they believe to be fair, while providing the Debtors with the potential of even greater benefit to the estates.  Further, the Expense Reimbursement was, and is, a material inducement for, and condition of, the Purchaser's offer to purchase the Acquired Assets.  Regis is unwilling to commit to hold open its offer without such protection.

23

34.     The Debtors submit that the proposed Expense Reimbursement will not chill bidding, is reasonable and will enable the Debtors to maximize the value of their estates. The Asset Purchase Agreement establishes a legitimate price floor allowing the Debtors to properly evaluate other competing bids that may be materially higher or otherwise better than the Purchaser's bid.  In addition, the $100,000 cap on the Expense Reimbursement represents less than .05% of the amount of the Purchaser's credit bid in the Asset Purchase Agreement. Notably, this percentage is less than other breakup fees and reimbursements regularly approved in this jurisdiction.  See, e.g., In re Basin Water, Inc., Case No. 09-12526 (MFW) (Bankr. D. Del. Aug. 28, 2009) (approving break-up fee and expense reimbursement); In re Badanco Acquisition LLC, Case No. 09-11638 (CSS) (Bankr. D. Del. Jul. 29, 2009) (approving expense reimbursement); In re Tweeter Home Entm't Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. June 26, 2007) (authoring debtors to offer up to 3% break-up fee if asset purchase agreement executed by specified deadline); In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. April 12, 2007) (approximately 2% break-up fee awarded); In re Radnor Holdings Corp., 06-10894 (PJW) (Bankr. D. Del Aug. 21, 2006) (approving a break-up fee and expense reimbursement); In re Women First Health Care, Case No. 04-11278 (MFW) (Bankr. D. Del. Sept. 8, 2004) (approving 2.9% break-up fee); In re Decora Indus., Inc., 2002 WL32332749 (D. Del. 2002) (Farnan, J.) (appellate court approving 3% break-up fee); In re Exodus Communications, Inc., Case No. 01-10539 (SLR) (Bankr. D. Del  Sept. 21, 2001) (approving a break-up fee and expense reimbursement).

35.     The amount of the Expense Reimbursement constitutes "a fair and reasonable percentage of the proposed purchase price."  In re S.N.A. Nut Company, 186 B.R. at 103; In re Tama Beef Packing, Inc., 312 B.R. at 198-199.  See In re Financial News Network,

Inc., 980 F.2d 165, 167 (3d (Cir. 1992) (noting that the break-up fee on the $149.3 million sale transaction at issue was $8.2 million, or over 5% of the sale price).  The Expense Reimbursement is customary for similar transactions of this type in the bankruptcy context and therefore is not "so substantial that it provides a 'chilling effect' on other potential bidders."  In re S.N.A. Nut Company, 186 B.R. at 103.  See also In re Wintz Companies d/b/a Milbank Freightways, 230 B.R. 840, 847 (B.A.P. 8th Cir.1999).

36.    In sum, the Expense Reimbursement provided for in the Asset Purchase Agreement is the product of arms' length negotiations between the Debtors on one side and Regis on the other.  Without these protections, Regis would not have made its offer and such protections are warranted in light of Purchaser's role as the "stalking horse" in the Sale.

**C.    The Bidding Procedures are Reasonable and Appropriate**

37.    The Debtors submit that under the facts and circumstances surrounding their proposed sale of the Acquired Assets and these Chapter 11 Cases generally, the Bidding Procedures are reasonable and appropriate and necessary to their efforts to preserve and maximize estate value.  The Debtors reserve their right to modify such procedures as necessary or they deem appropriate (after consultation with any Committee) to maximize the value of their estate.  In addition, the Debtors reserve the right to withdraw any or all Acquired Assets from the Sale at any time prior to Court approval of the Sale, subject to any limitations in this regard in the Asset Purchase Agreement.

**D.    The Proposed Notice of the Bidding Procedures is Appropriate**

38.    The Debtors believe that they will obtain the maximum recovery for their creditors if their assets are sold expeditiously, through a Court-supervised auction and sale process, such as the one provided for herein.  The Debtors, with the assistance of their

25

professional advisors, are in the process of actively marketing the Acquired Assets. In doing so, the Debtors have contacted, or will be contacting numerous potential purchasers and/or investors. However, as of the filing of this Motion they have been unable to identify any prospective purchasers other than the Purchaser. Against this backdrop, the Debtors believe that their service and publication of the Auction and Sale Notice, as previously described herein, is reasonable and appropriate and satisfies any and all requirements for such notice under the Bankruptcy Code, Bankruptcy Rules and Local Rules.

39.     Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Debtors' assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections. The Debtors respectfully submit that the notice procedures described herein, including, without limitation, the service and publication of the Auction and Sale Notice, satisfy Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Sale to all parties in interest in these Chapter 11 Cases, as well as to those parties which have expressed an interest, or may express an interest, in bidding on the Acquired Assets. The proposed period of time between the filing of this Motion and the commencement of the bidding process and the Auction, should give any and all interested purchasers more than enough time to participate in earnest in the auction and sale process proposed herein.

E.     **The Sale of the Debtors' Assets Free and Clear of Liens
and Other Interests is Authorized by Section 363(f)**

40.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, encumbrances, or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien

and the purchase price for the property is greater than the aggregate amount of all liens on the

property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien,

claim or interest could be compelled, in a legal or equitable proceeding, to accept a money

satisfaction for such interest.  11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In

re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is

written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least

one of the subsections is met).  Because the Debtors expect that they will satisfy, at minimum,

the second and fifth of these requirements, if not others as well, approving the Sale free and clear

of all adverse interests is warranted.  Furthermore, courts have held that they have the equitable

power to authorize sales free and clear of interests that are not specifically covered by section

363(f).  See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325 at *3, 6 (Bankr. D. Del.

March 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor

Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

**F.     Assumption and Assignment of Certain
        Executory Contracts and Unexpired Leases**

        41.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor-in-possession "subject to the court's approval, may assume or reject any executory

contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing

bankruptcy court approval of a debtor's decision to assume or reject an executory contract or

unexpired lease is whether the debtor's reasonable business judgment supports assumption or

rejection.  See, e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If

the debtor's business judgment has been reasonably exercised, a court should approve the

assumption or rejection of an unexpired lease or executory contract.  See Group of Institutional

Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp., 872 F.2d

27

36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting Stable Mews Assoc., 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

42. Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. See In re Rickel Home Centers, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist a trustee in realizing the full value of the debtor's assets).

43. Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc.,

28

54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. Accord In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

44.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. See In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a) of the Bankruptcy Code, a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., In re Chinichian, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

29

45.     The Debtors respectfully submit that Cure Procedures are appropriate and reasonably tailored to provide non-Debtor parties to the Assumed Contracts with adequate notice of the proposed assumption and assignment of their respective contracts, as well as proposed Cure Costs, if any.  Such non-Debtor parties to the Assumed Contracts will then be given an opportunity to object to such Cure Costs.  The Cure Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues, including any adequate assurance of future performance issues.  Accordingly, the Debtors submit that implementation of the Cure Procedures is appropriate under the facts and circumstances of these cases and the proposed sale.

**G.      The Successful Bidder Should Be Afforded All Protections Under Section 363(m) of the Bankruptcy Code as a Good Faith Purchaser**

46.     The Debtors request the Court to find that the Purchaser and its assignee are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

47.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Acquired Assets.

30

48.     The Debtors submit, and will present evidence at the Sale Hearing if necessary that, as set forth above, the Asset Purchase Agreement was an intensely negotiated, arms' length transaction, in which the Purchaser and its assignee, acted in good faith.  Indeed, the Purchaser's and its assignee's identity and affiliation with the Debtors has been fully disclosed in these proceedings, including the First Day Declaration, and the Debtors have fully disclosed and requested the Court's approval of all of the terms and conditions of the Sale.  Accordingly, the Debtors request the Court to find that the Purchaser has purchased the Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**H.     Relief Under Bankruptcy Rules 6004(h)**
        **and 6006(d) is Appropriate**

49.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an order "authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

50.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay periods, Collier on Bankruptcy suggests that the ten-day stay periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 Collier on Bankruptcy

YCST01:9726428.8                                                                                                                069219.1001

15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  <u>Id.</u>

51.     As described above, time is of the essence as the Debtors lack sufficient funding to operate their businesses on a prolonged basis.  Since promptly closing the Sale is of critical importance, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

<u>N**OTICE**</u>

52.     Notice of this Motion will be provided to:  (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to Regis; (c) the parties included on the Debtors' consolidated list of twenty (20) creditors holding the largest unsecured claims; (d) counsel to LFT II; (e) the Debtors' landlords; and (f); all parties requesting notice pursuant to Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: Wilmington, Delaware
July 6, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Joseph M. Barry*
James L. Patton, Jr. (No. 2202)
Joseph M. Barry (No. 4221)
Kenneth J. Enos (No. 4544)
Ryan M. Bartley (No. 4985)
Andrew L. Magaziner (No. 5426)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone:     (302)571-5039
Facsimile:     (302) 571-1253

*Proposed Counsel to the Debtors and Debtors-in-possession*

YCST01:9726428.8                    069219.1001